JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------x

UNITED STATES OF AMERICA            :

      - v -                         :

BALU KAMAT, and                     :   11 Cr.
CARMINE DESIO,

      Defendants.                  :

                       :

------------------------------------x

**SEALED INDICTMENT**

# 11 CRIM 2921



## COUNT ONE

(Mail and Wire Fraud Conspiracy)

### The Defendants

At all times relevant to this Indictment:

1. The defendant, BALU KAMAT, was the president of Environmental Energy Associates, Inc., ("EEA"), which was incorporated in the State of New York in or about 1989 and which maintained offices in Maspeth, New York, and at KAMAT's home in Ridgefield, New Jersey. KAMAT had a 51% equity stake in EEA, and his wife owned an additional 24.5% of EEA.

2. The defendant, CARMINE DESIO, was the vice president of EEA and had a 24.5% equity stake in EEA.

### The Disadvantaged Business Enterprise Program

3. In 1980, the United States Department of Transportation ("USDOT") issued regulations in connection with a program to increase the participation of minority and disadvantaged business enterprises ("DBEs") in federally-funded public construction contracts. Pursuant to those regulations,

recipients of USDOT construction grants are required to establish a DBE program that, among other things, (1) establishes goals for the percentage of a construction project's work that should be awarded to DBEs ("DBE goals"); and (2) requires general contractors on construction projects to make good faith efforts to meet the relevant DBE goals.

4.    To become certified as a DBE, a company must, among other things, be owned and controlled by socially and economically disadvantaged individuals who own at least 51% of the company.  Additionally, the company must be an independent business, one whose viability does not depend on its relationship with another firm or firms:  The company must employ its own work force, own equipment necessary to perform its work, and be able to meet its financial obligations.  To undertake work as a DBE, a company must also be certified as a DBE in the state within which it seeks to perform work.

5.    General contractors are permitted to count toward the attainment of their DBE percentage goals only funds paid to DBEs that performed a "commercially useful function" in the execution of a contract.  Under the relevant rules and regulations, a DBE subcontractor performs a commercially useful function only where it: (a) is responsible for the execution of the work of the contract; (b) carries out its responsibilities by actually performing, managing, and supervising the work involved;

and (c) furnishes the supervision, labor, and equipment necessary
to perform its work.  The rules also expressly provide that a DBE
does not perform a commercially useful function "if its role is
limited to that of an extra participant in a transaction,
contract, or project through which funds are passed in order to
obtain the appearance of DBE participation."

6.   At all times relevant to this Indictment, EEA was
a certified DBE.

<u>Overview of the Criminal Scheme</u>

7.   From at least in or about 1997 up to and including
in or about 2011, BALU KAMAT and CARMINE DESIO, the defendants,
and their company, EEA, engaged in systematic fraud in connection
with the DBE programs adopted by, among others, the Metropolitan
Transit Authority ("MTA"), the Port Authority of New York and New
Jersey ("Port Authority"), and various New York City agencies
such as the New York City Department of Environmental Protection
and the School Construction Authority.  The scheme typically
worked as follows.

8.   BALU KAMAT and CARMINE DESIO, the defendants,
caused EEA to enter into lucrative public construction
subcontracts to perform an array of work including general
construction, demolition, air testing, soil sampling, and
hazardous gas monitoring.  In truth and in fact, and as KAMAT and
DESIO well knew, EEA was itself incapable of completing the work

3

they contractually agreed to have EEA perform. Among other things, EEA lacked any independent labor force and indeed had no regular employees other than KAMAT and DESIO; EEA did not own any significant equipment; and while KAMAT and DESIO possessed some relevant knowledge, they lacked the expertise to supervise the broad range of work that they caused EEA to contract to perform.

9.  BALU KAMAT and CARMINE DESIO, the defendants, arranged to have non-DBE third-parties actually perform the work that EEA contracted to perform, and these non-DBE third parties accordingly provided all the significant labor, equipment, and supervision necessary to complete that work. In some cases, KAMAT and DESIO allowed the primary contractor to effectively self-perform the work itself and create the false appearance that EEA was performing the work. In these cases, the primary contractor simply shifted its own workers to EEA's payroll; the primary contractor supervised the "EEA workers" as they performed the work; the primary contractor directly or indirectly furnished the equipment necessary for "EEA" to perform the work; and the primary contractor paid EEA the funds necessary to meet the "EEA payroll."

10.  On forms submitted to the primary contractor and/or the relevant government agency or authority overseeing the construction project, BALU KAMAT and CARMINE DESIO, the defendants, falsely represented that EEA had performed the work they had subcontracted to complete, knowing that the primary

4

contractors would, in turn, claim DBE credit in connection with EEA's work.  Indeed, the primary contractor then falsely represented to the relevant government agency or authority that EEA had performed the work and that the primary contractor should, as a result, receive DBE credit for EEA's work.

        11.  BALU KAMAT and CARMINE DESIO, the defendants, EEA, and other co-conspirators not named herein engaged in DBE fraud in connection with the following significant public construction projects, among others: (1) a variety of projects with the northeast United States division of an international construction firm ("Contractor #1"), including but not limited to the Fulton Street Transit Center - Dey Street Concourse; (2) the World Trade Center Transportation Hub Project; (3) the sanitary sewer force main for a certain terminal at the John F. Kennedy International Airport ("JFK"); and (4) various environmental testing and monitoring projects.

        <u>Fulton Street Transit Center - Dey Street Concourse</u>

        12.  In or about 2004, the MTA began work on the Fulton Street Transit Center Rehabilitation Project, a federally-funded initiative to develop a new transportation hub that would improve access to and connections among various subway lines in lower Manhattan.  Part of that project included the creation and construction of a new underground passageway at Dey Street that would enable passengers on the "R" and "W" subway lines to

transfer to the "4" and "5" lines and vice versa ("Dey Street Concourse Project").

13.  In or about the summer of 2005, following a competitive bidding process, the MTA awarded the Dey Street Concourse contract to Contractor #1 in the amount of approximately $133 million.  The MTA established a 10% DBE goal in connection with this contract, meaning that Contractor #1 was obligated to make good faith efforts to enter into subcontracts with DBEs, the total value of which would equal 10% of the overall contract.

14.  On or about September 21, 2005, BALU KAMAT, the defendant, signed a subcontract with Contractor #1 pursuant to which EEA agreed to perform concrete and miscellaneous demolition work on the Dey Street Concourse Project for an amount not to exceed $5,200,000.  EEA's subcontract with Contractor #1 represented 4.06% of the value of Contractor #1's contract on the Dey Street Concourse Project and, as a result, represented an achievement of roughly 40% of Contractor #1's DBE goal for the Dey Street Concourse Project.  Ultimately, due to project modifications, Contractor #1 paid EEA over $7 million for demolition and excavation work purportedly performed by EEA.

15.  EEA did not provide a "commercially useful function" in connection with the Dey Street Concourse Project because, in fact, Contractor #1 effectively self-performed the work it had subcontracted to EEA and helped create the appearance

6

that EEA had done commercially useful work on the project.  For
example, with respect to the labor EEA supplied on the project,
Contractor #1 arranged to and did transfer three of its own long-
standing foremen to EEA's payroll so that these foremen could
take the lead on the demolition work EEA had contracted to
perform.  The crew that previously had worked with one of the
three foremen on Contractor #1's other projects also transferred
to EEA's payroll so that the foreman could perform the work with
a crew of laborers familiar to him.  With respect to equipment,
because EEA did not have any meaningful equipment of its own, EEA
used Contractor #1's equipment while performing work on the
subcontract, ranging from large equipment like a compressor to
smaller supplies like shovels and gloves.  Contractor #1 even
made its own utility shed available to EEA - a benefit not
regularly provided to any other subcontractor on the Dey Street
Concourse Project.  When it came to purchasing equipment for the
subcontract, employees of Contractor #1, not BALU KAMAT and
CARMINE DESIO, the defendants, negotiated the terms of equipment
orders.  Contractor #1's employees simply communicated the terms
and nature of these orders to KAMAT and DESIO so that KAMAT and
DESIO could submit purchase orders for the equipment and, in so
doing, make it appear as though EEA was providing a commercially
useful function.  And because EEA did not have the financial
wherewithal to pay its workers, Contractor #1 typically
transferred funds to corporate bank accounts controlled by KAMAT

and DESIO so that KAMAT and DESIO could afford to issue paychecks
to its workers.

16.  Each month during the duration of the project --
in or about the fall of 2005 up to and including in or about 2009
-- BALU KAMAT and/or CARMINE DESIO, the defendants, submitted
records, including certified payroll records, to Contractor #1
reflecting the work that EEA "employees" were performing, knowing
that, on the basis of these records, Contractor #1 would submit
monthly reports to the MTA reflecting EEA's DBE progress.  On the
forms submitted by Contractor #1 to the MTA concerning the Dey
Street Concourse Project, Contractor #1 certified, among other
things, that none of the DBE subcontractors utilized employees or
former employees of Contractor #1 within the previous month,
when, in fact, EEA had not only utilized former employees of
Contractor #1 but, in certain months, utilized employees of
Contractor #1 who had worked for Contractor #1 at the beginning
of that same month.

17.  The Dey Street Concourse Project was only one of a
number of projects for which EEA contracted to perform work for
Contractor #1.  On multiple other projects for which Contractor
#1 served as prime contractors, BALU KAMAT and CARMINE DESIO, the
defendants, entered into subcontracts with Contractor #1 and
endeavored to make it appear as though EEA was providing or would
provide a commercially useful function when, in fact and as KAMAT
and DESIO well knew, either Contractor #1 intended to effectively

self-perform EEA's work, as occurred in connection with the Dey Street Concourse Project, or Contractor #1 had arranged to have a third party non-DBE substantially perform EEA's work.  These other projects included the 74th Street/Roosevelt subway station project; the Dekalb Avenue subway station project; the Times Square subway station project; the 53rd Street/Lexington Avenue subway station project; the Corbin Center portion of the Fulton Transit Center project; the Brooklyn Queens Expressway reconstruction project; and the Harmon Yard project.  In connection with the above listed projects, Contractor #1 intended to pay EEA in excess of $26 million and actually paid EEA approximately $19.6 million.

<u>The World Trade Center Transportation Hub</u>

18.   In or about 2007, the Port Authority began construction on the new World Trade Center Port Authority Trans-Hudson (PATH) Transportation Hub located close to the northeast corner of the World Trade Center site at Church and Fulton Streets.  The 800,000 square-foot Hub was designed to accommodate 250,000 pedestrians per day and, among other features, will include a multi-story central transit hall, enhanced PATH facilities and services, retail facilities, and an integrated network of underground pedestrian connections to New York City Transit subway stations and the Fulton Street Transit Center.  Through the Federal Transit Administration, the USDOT has committed approximately $1.92 billion toward the more than

$3.2 billion project, with the Port Authority investing the difference.

19.   In or about January 2006, following a competitive bidding process, the Port Authority awarded a more than $1 billion contract to a joint venture consisting of four construction companies ("Contractor #2") to serve as construction manager/general contractor for the construction of the Transportation Hub.  In connection with the contract for the Transportation Hub, the Port Authority established a 17% goal for minority and women's business enterprises ("M/WBEs") -- a program that is identical to the MTA's DBE program in all material and relevant respects.  This meant that Contractor #2 was obligated to make good faith efforts to enter into subcontracts with M/WBEs, the total value of which would equal at least 17% of the overall contract amount.

20.   One component of the Transportation Hub project involved "dewatering" the east basin of the Hub, a process by which water would be removed from the solid material and soil. In or about February 2007, Contractor #2 awarded an approximately $6 million subcontract to a New Jersey-based construction and geotechnical services company with a special expertise in dewatering ("Contractor #3") to perform those dewatering services.  Contractor #3, in turn, entered into a second-tier subcontract with EEA (the "WTC Dewatering Contract") pursuant to which EEA would supply and operate certain dewatering equipment.

Ultimately, Contractor #3 paid EEA in excess of $2 million in connection with the WTC Dewatering Contract.  Furthermore, Contractor #2 claimed M/WBE credit for the value of the work EEA purportedly completed in connection with the WTC Dewatering Contract.

21.  In truth and in fact, and as BALU KAMAT and CARMINE DESIO, the defendants, well knew, EEA did not provide a "commercially useful function" in connection with the dewatering of the east basin of the Transportation Hub.  On the contrary, Contractor #3 effectively self-performed the work it had subcontracted to EEA, and KAMAT, DESIO, EEA and Contractor #3 helped create the appearance that EEA had done commercially useful work on the project.  For example, Contractor #3 arranged for the hiring of EEA's purported labor force, directed those workers to complete new hire forms in the name of Contractor #3, and simply forwarded the information about the workers to KAMAT and/or DESIO.  In addition, employees of Contractor #3 supervised the dewatering work that EEA contracted to perform and, each week, an administrative employee of Contractor #3 prepared payroll reports listing the names of the purported EEA workers and showing the hours they had worked and the wages they had earned during the prior week.  That employee of Contractor #3 then faxed the payroll information to KAMAT and/or DESIO so that they, in turn, could prepare certified payrolls, and, in so doing, maintain the appearance that EEA employees had performed

the work.  KAMAT and/or DESIO then submitted, back to Contractor #3, certified payrolls based on the information that Contractor #3 had provided to EEA in the first place.  These records reflecting the work of EEA's purported labor force ultimately were submitted to the Port Authority or its agent.

22.  As BALU KAMAT and CARMINE DESIO, the defendants, knew, EEA also lacked the type of equipment necessary to perform the specialized dewatering services it had contracted to perform pursuant to the WTC Dewatering Contract.  Accordingly, EEA simply used the equipment of Contractor #3 to perform this work. Finally, because EEA did not have the financial wherewithal to pay its purported workers, EEA would regularly bill Contractor #3 for its labor costs (plus a specified markup), and Contractor #3 would then transfer funds to corporate bank accounts controlled by KAMAT and DESIO so that KAMAT and DESIO could afford to issue paychecks to the workers.

<u>The JFK Terminal</u>

23.  In or about the summer of 2004, the Port Authority entered into an agreement with an airline carrier ("Airline") to develop and operate a new terminal building at JFK.  Under the Port Authority's lease agreement with the Airline, the Port Authority was required to provide infrastructural support for the new terminal, including the provision of a sanitary sewer connection.

24.   In or about July 2006, following a competitive
bidding process, the Port Authority awarded a contract of more
than $2.5 million to a general contractor located in Queens, New
York ("Contractor #4") for the installation of the sanitary sewer
connection, which work required, among other things, dewatering.
The Port Authority established a 16.4% DBE goal in connection
with the sanitary sewer connection contract, meaning that
Contractor #4 was obligated to make good faith efforts to enter
into subcontracts with DBEs, the total value of which would equal
at least 16.4% of the overall contract.   In or about July 2006,
in order to satisfy that DBE goal, Contractor #4 entered into an
approximately $450,000 subcontract with EEA to perform dewatering
services in connection with the installation of the sanitary
sewer connection.   Because the total value of the subcontract
with EEA exceeded 16.4% of the overall value of the sanitary
sewer connection contract, Contractor #4 was positioned to
satisfy its entire DBE goal with its subcontract with EEA.
Ultimately, Contractor #4 paid EEA approximately $189,000.

25.   EEA did not provide a "commercially useful
function" in connection with the dewatering services it had
contracted to perform for Contractor #4. In truth and in fact,
BALU KAMAT and CARMINE DESIO, the defendants, arranged for a
third-party non-DBE -- namely, Contractor #3 -- to perform the
work EEA agreed to perform in the first place. EEA simply issued
a purchase order to Contractor #3, signed by DESIO and a

13

representative of Contractor #4, engaging Contractor #3 to

perform the same services that EEA had contracted with Contractor

#4 to perform.  EEA's purchase order specified, among other

things, that "[e]xact quantities ordered and utilized shall be

determined in the field between representatives of [Contractor

#4] and [Contractor #3]."  To maintain the appearance that EEA

performed the work that Contractor #3 in fact performed, an

administrative employee of Contractor #3 faxed, to KAMAT and/or

DESIO, payroll reports reflecting the names, hours, and wages of

those performing work on the sanitary sewer connection.  KAMAT

and/or DESIO, in turn, prepared and submitted certified payrolls

to Contractor #4.  These records reflecting the work of EEA's

purported labor force ultimately were submitted to the Port

Authority.

<u>Environmental Testing Work</u>

        26.  Between at least 2000 and 2010, EEA entered into

contracts to perform various environmental testing work in

connection with public works contracts with, among other

agencies, the MTA and the New York City Department of

Environmental Protection.  Rather than performing the work on its

own, EEA -- at the direction of BALU KAMAT and CARMINE DESIO, the

defendants -- arranged for a third party non-DBE to perform the

work, namely, a certain environmental company located in

Farmingdale, New York ("Environmental Company").  Pursuant to an

undisclosed profit-sharing arrangement between the Environmental

Company and EEA, employees of the Environmental Company --
including the president and owner of the Environmental Company,
who also independently purported to be EEA's vice president --
performed the work.  The employees of the Environmental Company
performed EEA's work using equipment and materials belonging to
the Environmental Company.  Moreover, to create the appearance
that EEA -- rather than the Environmental Company -- was
performing the work, administrative employees of the
Environmental Company: (1) prepared certified payrolls listing
the names of the purported EEA employees and showing their hours
and wages; (2) possessed and issued EEA checks so that they could
issue paychecks to employees of the Environmental Company when
those employees did "EEA" work; and (3) possessed and used a
signature stamp bearing DESIO's signature in order to sign
payroll checks to the purported EEA employees.

### Statutory Allegation

27.  From in or about 1997 up to and including in or
about 2011, in the Southern District of New York and elsewhere,
BALU KAMAT and CARMINE DESIO, the defendants, together with
others known and unknown, unlawfully, willfully, and knowingly
did combine, conspire, confederate, and agree, together and with
each other, to commit mail fraud and wire fraud, in violation of
Title 18, United States Code, Sections 1341 and 1343.

28.  It was a part and an object of the conspiracy that
BALU KAMAT and CARMINE DESIO, the defendants, and others known

and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office or authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and would and did cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and would and did take and receive therefrom, a matter and thing, and would and did knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, in violation of Title 18, United States Code, Section 1341.

29.   It was further a part and an object of the conspiracy that BALU KAMAT and CARMINE DESIO, the defendants, and others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the

purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

30.   In furtherance of the conspiracy and to effect the illegal objects thereof, BALU KAMAT and CARMINE DESIO, the defendants, and their coconspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about September 21, 2005, KAMAT signed a subcontract with Contractor #1.

b.   On or about October 18, 2006, DESIO signed and submitted to Contractor #3 a purchase order to provide certain services in connection with the sanitary sewer connection at JFK.

c.   On or about July 16, 2007, an employee of Contractor #3 faxed payroll information from Contractor #3's office in New Jersey to DESIO's attention at EEA's office in Maspeth, New York.

d.   On or about September 17, 2009, KAMAT mailed to the MTA in Manhattan, New York a payment verification form certifying, among other things, that EEA had not utilized employees or former employees of Contractor #1.

(Title 18, United States Code, Section 1349)

## COUNT TWO

(Mail Fraud In Connection With the Dey Street Concourse Project)

The Grand Jury further charges:

31.  The allegations of paragraphs 1 through 17 of this Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

32.  From in or about the fall of 2005 up to and including in or about 2009, in the Southern District of New York, BALU KAMAT and CARMINE DESIO, the defendants, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and did cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and did take and receive therefrom, a matter and thing, and did knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, KAMAT and DESIO engaged in a scheme to commit DBE fraud in connection with the Dey Street Concourse Project and for the purpose of executing this scheme sent mailings to the MTA

including the payment verification form described in paragraph 30(d) above.

(Title 18, United States Code, Sections 1341 & 2)

## FORFEITURE ALLEGATION

33.   As a result of committing the offenses alleged in Counts One and Two of this Indictment, BALU KAMAT and CARMINE DESIO, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

### Substitute Asset Provision

34.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  a.   cannot be located upon the exercise of due diligence;

  b.   has been transferred or sold to, or deposited with, a third person;

  c.   has been placed beyond the jurisdiction of the Court;

  d.   has been substantially diminished in value; or

  e.   has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

20

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### BALU KAMAT, and
### CARMINE DESIO,

**Defendants.**

### <u>INDICTMENT</u>

11 Cr.

(18 U.S.C. §§ 1341 and 1349)

<u>PREET BHARARA</u>
United States Attorney.

**A TRUE BILL**

Foreperson.

3-30-11   Filed Indictment A/W issued
NO       Under Seal.

Maas
U.S.M.J